# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

## AT KNOXVILLE

## FEBRUARY SESSION, 1999

FILED

June 3, 1999

Cecil Crowson, Jr.
Appellate Court
Clerk

| | | |
|---|---|---|
| STATE OF TENNESSEE, | ) | C.C.A. NO. 03C01-9805-CR-00169 |
| | ) | |
| Appellee, | ) | |
| | ) | |
| | ) | HAMILTON COUNTY |
| VS. | ) | |
| | ) | HON. STEPHEN M. BEVIL |
| DEDRA A. LANE, | ) | JUDGE |
| | ) | |
| Appellant. | ) | (Direct Appeal) |

FOR THE APPELLANT:

DON W. POOLE
732 Cherry Street
Chattanooga, TN 37402

FOR THE APPELLEE:

JOHN KNOX WALKUP
Attorney General and Reporter

ELLEN H. POLLACK
Assistant Attorney General
425 Fifth Avenue North
Nashville, TN 37243-0493

BILL COX
District Attorney General

H. C. BRIGHT
Assistant District Attorney
Third Floor Hamilton County-City
        Court's Building
Chattanooga, TN 37402

OPINION FILED _____

AFFIRMED

JERRY L. SMITH, JUDGE

# OPINION

On November 19, 1997, the Hamilton County Grand Jury indicted Appellant Dedra A. Lane for aggravated assault and for unlawfully carrying a weapon with intent to go armed. On January 12, 1998, Appellant filed an application for pretrial diversion with the district attorney general. The district attorney general denied the application. On April 1, 1998, Appellant filed a petition for writ of certiorari in the Hamilton County Criminal Court, alleging that the district attorney general had abused his discretion when he denied her petition. After a hearing on April 6, 1998, the trial court found that the district attorney general did not abuse his discretion when he denied Appellant's petition. On April 23, 1998, Appellant filed a motion to appeal the interlocutory order. The trial court initially denied the motion, but the trial court subsequently rescinded its original order and granted permission to appeal. On June 18, 1998, this Court granted Appellant an interlocutory appeal pursuant to Tenn. R. App. P. 9. Appellant challenges the denial of her petition for pretrial diversion, raising the following issue: whether the trial court correctly found that the district attorney general did not abuse his discretion when he denied Appellant's petition for pretrial diversion. After a review of the record, we affirm the judgment of the trial court.

## FACTS

The record indicates that Appellant married James (Jim) M. Lane, Jr., on August 14, 1996. On May 20, 1997, Appellant gave birth to their son, Ethan Lane. Appellant and Ethan Lane moved out of the home they shared with Mr.

Lane on June 13, 1997. On July 1, 1997, Mr. Lane asked to see Ethan. Appellant took Ethan to Mr. Lane's home on July 2, 1997, with the understanding that Mr. Lane would return Ethan on July 4, 1997.

On July 4, 1997, Mr. Lane called Appellant at her place of employment at approximately 11:30 a.m. Appellant then called the police station and left a message for Detective Chris Chambers. Appellant then reported to her supervisor that Mr. Lane was not going to return Ethan and she was going to try to get Ethan back. The supervisor then offered to drive Appellant to Mr. Lane's home, but Appellant refused and told her supervisor that he did not need to get involved in the situation.

Shortly thereafter, Appellant stopped at a gas station to fill up her car. Detective Chambers then paged Appellant and when Appellant called him back, Chambers told Appellant to meet him and some other officers at another location. When Appellant told Chambers that Mr. Lane would not give Ethan back, Chambers told Appellant that unless there was a court order, the police could not take Ethan from Mr. Lane. Appellant did not tell Chambers that Ethan was in danger.

Appellant then drove for approximately forty-five minutes to a location where she met Officer Porter McKamey. McKamey then told Appellant that because she and Mr. Lane were not divorced, the police could not take Ethan from Mr. Lane if he did not want to give up custody. McKamey then told Appellant that he wanted her to wait until another officer arrived. Appellant then responded that she would go and get Ethan herself because "she could probably

get more accomplished without a car being there at that particular time." Appellant did not tell McKamey that Ethan was in danger.

Appellant then left that location and traveled to Mr. Lane's home. Appellant subsequently entered the home and pointed a .380 automatic handgun at Mr. Lane's head. Appellant then forced Mr. Lane to sit down and she began screaming and yelling. At this time, Ethan Lane was upstairs with Mr. Lane's twelve-year-old son from a previous marriage, Eric Lane.

After Officer McKamey met Officer Sharkie Adams at the gas station, the two officers traveled to Mr. Lane's home. Upon arriving at the scene, McKamey could see that Appellant was pointing a gun at Mr. Lane's head. When McKamey ordered Appellant to drop the gun, Appellant turned around and said "no" and then turned and pointed the gun at Mr. Lane's head again. McKamey considered shooting Appellant, but decided not to because he would have had to fire through a glass door and the bullet probably would have been deflected.

Shortly thereafter, Detective Chambers entered Mr. Lane's home and saw that Appellant had cocked the gun and was pointing it at Mr. Lane's head. Chambers then heard Appellant say "You're going to sign this child over to me. I'm not 'F' Lori Lane. You're not going to mess with me. I'm [sic] kill you." Chambers then snuck up behind Appellant and tackled her and took the gun away.

According to Appellant's version of events, she had suffered through a difficult pregnancy and subsequent delivery and she had never received any help

-4-

from Mr. Lane. Further, Mr. Lane had told her during the telephone call that she would not get Ethan back unless she made a deal with him about payment of child support. Mr. Lane then stated that he was going to take Ethan on a "road trip." Appellant testified that she only pointed the gun at Mr. Lane so that she could get Ethan back and because she believed that Mr. Lane would kill Ethan if she did not take action. Appellant also testified that although she did not remember everything she said during the incident, she did not say that she would kill Mr. Lane. Appellant further testified that while she acknowledged that what she had done was criminally wrong, she believed that what she had done was morally right.

According to Mr. Lane's version of events, he and Appellant had agreed during the telephone call to meet at his home to discuss Ethan's care. Mr. Lane denied telling Appellant that he would take Ethan away so that she would never see him again. Mr. Lane stated that he had been working for the city for twenty years and he was raising two boys, thus, he would not go anywhere else.

Mr. Lane testified that when he let Appellant into his home, she cocked the gun and held it to the back of his head. Appellant then made some "abusive remarks" that were "quite vulgar." Appellant then told Mr. Lane that she was going to kill him and she would only receive an eighteen month sentence because it would be her first offense. At that time, Appellant heard Eric Lane make a noise and she stated that she was "not going to leave any witnesses."

Mr. Lane also testified that when Officer McKamey told Appellant to put the gun down, she told Mr. Lane, "Get ready to meet your F'ing maker." Mr. Lane

-5-

stated that as a result of Appellant's actions, he and Eric Lane had both lost a lot of weight and Eric had to undergo therapy.

According to Eric Lane, he was at Mr. Lane's home when Appellant entered the home with a gun. When Appellant heard Eric walking up the stairs, she made some "very violent" remarks. Eric stated that Appellant also threatened to kill Mr. Lane and said that she would only receive an eighteen month sentence for doing so. Eric also stated that as a result of Appellant's actions, he could not sleep at night, he had been unable to maintain a stable weight, and he had been taking medication.

Numerous individuals either testified at the hearing or submitted statements with the petition for pretrial diversion indicating that they believed that Appellant was a good person and that her actions during the events in question were inconsistent with her previous behavior.

The district attorney general denied Appellant's petition for pretrial diversion based on the following reasons:

> 5. The Defendant's "social history" is generally good. The information about the Defendant's past comes mainly from her filings with her diversion application and with the Court. It appears that she has no past criminal history; that she is employed in a well-paid, responsible position; and has no history of drug or alcohol abuse which has resulted in arrest. Her educational attainments and "contributions to society" are unremarkable. Several people including law enforcement officers attest to her otherwise good character.
> 6. The Defendant married on her twentieth birthday and was divorced less than two years later. She married the victim of this crime three years later, and bore a child nine months afterward. She committed this crime a few weeks after the birth.
> 7. The Defendant claims no physical or psychological impairment. She has continued to function well both before and after the crime.

-6-

8.  Information surrounding the circumstances of the crime comes from the Defendant's version as well as the reports of the victim and law enforcement officers.  These witnesses will be available for testimony at the hearing in this matter.  The undisputed facts are that the Defendant and the victim had disagreements and had separated.  No divorce or other proceedings had begun.  They shared child care duties.  Following a dispatch to the victim's home, Sheriff's deputies found the Defendant holding the victim at the point of a loaded pistol.  The infant and the victim's child from a previous marriage were in the house.  She refused to drop or point away the gun, and was eventually tackled by Detective Chambers.

9.  The Defendant claims that she was telephoned earlier by the victim and that he told her that he would not relinquish the child.  She claims that she believed that the victim intended to harm the infant.  She told a co-worker about this, and the co-worker offered to assist.  The Defendant rejected this offer.  She then, after the passage of time, called deputies and met them at a market.  She was told that the officers would deal with the situation.  She refused this help, left, and went to the victim's house.

10.  The victim, a senior Firefighter, denies having refused to turn over the child.  He says that he expected the Defendant to remove the child, and that the child's traveling bag was packed and waiting.

11.  Detective Chambers explains that there had been a previous call to the Lanes' house, and that he had explained to the Defendant the help available to her in case of violence or danger.  Chambers is a long time acquaintance of the victim.  Immediately before going to the victim's house, Chambers told the Defendant to wait and that he would come help with the problem.  At that time, the Defendant referred to the gun she had.

12.  Witnesses will testify that they believe the Defendant intended to kill the victim, and that only Chambers' physical intervention prevented her.

13.  The State believes that the Defendant's pre-offense history is not inconsistent with the idea of rehabilitation.  She was an honest citizen of good apparent character.  There appears at this time nothing to indicate that she will re-offend.  However, there was nothing in that history to indicate that she would offend the first time, either.

14.  The State believes that the Defendant's actions even as she explains them indicate that she is a poor candidate for rehabilitation and that she must be specifically deterred and punished.  This is a successful, articulate person who is used to solving problems every day.  The Defendant, already experienced with the process of divorce, rejected the lawful path to deal with the situation she claims existed.  Although she claims that she was concerned for the infant's safety, she did not immediately call for help.  The Defendant repeatedly, over a period of hours, actively rejected the assistance of a co-worker and the police.  Even after the officers arrived, she continued to menace and terrorize the victim.  Even if the Defendant's claims are true, they provide neither defense nor justification.  She continues to blame the victim for her conduct.

15.  There is no reason to believe that the Defendant's version is accurate. Her actions are inconsistent with a parent fearing for her infant's safety.  They are more consistent with a woman who chose, after

deliberation and premeditation, to take a gun in hand to settle a score. The victim maintains that the Defendant's story is a fabrication. At this point, the State agrees.

16. The Defendant trivializes and depreciates the harm she did—" . . . (she) caused no harm or difficulty to Mr. Lane whatsoever." Mr. Lane and his son have suffered harm as they will testify.

17. In addition to specific deterrence, the Defendant's actions call for general deterrence and diversion would depreciate the seriousness of the crimes. The Defendant's conduct is the fruit of two crimes, the assault and the unlawful carrying of the pistol, which began some time previously.

18. The Defendant's conduct threatened harm to 7 [later amended to nine] people—the Defendant, the victim, the three [later amended to five] officers, the victim's son, and the infant child. Two of these were especially vulnerable due to age. Detective Chambers and the other Deputies chose not to shoot the Defendant, but increased their risk by exposing themselves to her fire. The State commends their restraint. That restraint continued in the Courts, when the Defendant was charged with these offenses rather than additional Felony Reckless Endangerments or Especially Aggravated Kidnapping, a class A felony.

19. Homicide is the most serious crime. This is a case in which the Defendant may well have killed if the Deputies had not intervened.

20. This is a "domestic" crime. In recognition of the harm done to our community by this sort of crime, the justice system and legislature have acknowledged our responsibility to treat these cases seriously and to provide assistance to prevent them. These efforts are under way in this County and are succeeding, in part due to a public perception that these crimes will be taken seriously. The Defendant should not be rewarded for rejecting assistance.

21. On balance, the State believes that the factors against diversion far outweigh those in favor. The interests of justice demand that this case proceed to a determination of guilt.

## ANALYSIS

Appellant contends that the trial court erred when it found that the district attorney general did not abuse his discretion when he denied her petition for pretrial diversion. We disagree.

The decision to grant pre-trial diversion rests within the discretion of the district attorney general. Tenn. Code Ann. § 40-15-105(b)(3) (Supp. 1998); State v. Pinkham, 955 S.W.2d 956, 959 (Tenn. 1997); State v. Lutry, 938 S.W.2d 431,

433 (Tenn. Crim. App. 1996). The district attorney general must consider the following factors when making that determination:

> the circumstances of the offense; the criminal record, social history, and present condition of the defendant, including his mental and physical conditions where appropriate; the deterrent effect of punishment upon other criminal activity; the defendant's amenability to correction; the likelihood that pre-trial diversion will serve the ends of justice and the best interests of both the public and the defendant; and the applicant's attitude, behavior since arrest, prior record, home environment, current drug usage, emotional stability, past employment, general reputation, marital stability, family responsibility, and attitude of law enforcement.

State v. Morgan, 934 S.W.2d 77, 81 (Tenn. Crim. App. 1996). "If the district attorney general denies pretrial diversion, that denial must be written and must include both an enumeration of the evidence that was considered and a discussion of the factors considered and weight accorded each." Pinkham, 955 S.W.2d at 960.[1]

If pretrial diversion is denied by the district attorney general, a defendant may petition for a writ of certiorari to the trial court. Tenn. Code Ann. § 40-15-105(b)(3) (Supp. 1998). However, the decision of the district attorney general "is presumptively correct and shall be reversed only when the appellant establishes that there has been a patent or gross abuse of prosecutorial discretion." State v. Houston, 900 S.W.2d 712, 714 (Tenn. Crim. App. 1995). "In order to establish abuse of discretion, the record must show an absence of any substantial evidence to support the district attorney[ general's] refusal to grant pretrial diversion." Id. (citation and internal quotations omitted). "The trial court may only consider evidence considered by the district attorney general in the decision

---

[1]The district attorney general is not required to include in the record all the evidence relied upon to deny diversion. Pinkham, 955 S.W.2d at 960. Instead, the district attorney general must identify the factual basis and rationale for the decision to deny pretrial diversion and that information should be sufficiently detailed so that the defendant can ascertain the existence of any factual disputes. Id.

denying pre-trial diversion, and the trial court may not substitute its judgment for that of the district attorney general when his decision is supported by the evidence." Lutry, 938 S.W.2d at 433 (citations omitted). For purposes of review, the findings of the trial court are binding on this Court unless the evidence preponderates against such findings. Houston, 900 S.W.2d at 715.

Contrary to Appellant's assertions, the record indicates that the district attorney general evaluated each of the relevant factors in making the determination to deny the request for pretrial diversion. Further, the record indicates that the district attorney general's conclusions are generally supported by the evidence in the record.

The district attorney general recognized that there were several factors that would support a grant of pretrial diversion. The district attorney general recognized that Appellant had no previous criminal record, that her social history was generally good, and that she had a good reputation in the community. The district attorney general also recognized that Appellant had a good employment history and she had no history of drug or alcohol abuse.[2] However, the district attorney general determined that these factors were outweighed by other factors which indicated that pretrial diversion was not appropriate.

The district attorney general determined that the circumstances of the offenses indicated that pretrial diversion was not appropriate. The district

_____

[2]It is not clear what the district attorney general was referring to when he indicated that Appellant had not claimed any physical or mental impairment. Indeed, the record indicates that Appellant did claim that she suffered through a difficult pregnancy and subsequent delivery shortly before the offenses at issue here. However, we conclude that under the circumstances of this case, this factor does not affect the ultimate determination of whether the district attorney general abused his discretion when he denied the request for pretrial diversion.

-10-

attorney general noted that during the incident at Mr. Lane's home, Appellant endangered the lives of Mr. Lane, two minor children, and several police officers. The district attorney general also relied on the fact that Appellant had refused to put the gun down even when ordered to do so by police. The district attorney general also relied on evidence which indicated that Appellant would have killed Mr. Lane if the police had not intervened. Indeed, Jim and Eric Lane both testified that Appellant stated that she was going to kill Mr. Lane and she would only receive an eighteen month sentence for doing so. Chambers also testified that he heard Appellant tell Mr. Lane that she was going to kill him.

The district attorney general also based his decision to deny the request for pretrial diversion on Appellant's poor potential for rehabilitation. First, the district attorney general found that Appellant's version of the events was a fabrication. The district attorney general based that determination on the Appellant's acting in a way that was inconsistent with a belief that Ethan was in danger. Indeed, the record indicates that Appellant did not tell either Chambers or McKamey that Ethan was in danger and that she refused to put the gun away when the police officers arrived at Mr. Lane's home. The district attorney general also based his determination that Appellant had poor potential for rehabilitation on the fact that Appellant had refused the help of law enforcement officers and had decided to take matters into her own hands. In fact, Appellant testified that she purposefully took the gun with her to Mr. Lane's home for use in retrieving Ethan. The district attorney general also determined that Appellant had poor potential for rehabilitation because she had failed to accept responsibility for her actions. Indeed, Appellant testified at the hearing, "I understand that, criminally, I did wrong; but, as far as my child still breathing, I did right, morally." Further,

-11-

after observing Appellant's demeanor and listening to her testimony, the trial court found that Appellant had shown that she was not capable of handling anger and she was likely to become volatile again in similar situations.

The district attorney general also based his decision to deny the request for pretrial diversion on Appellant's attitude. Specifically, the district attorney general found that Appellant had continued to trivialize the harm she had done while committing the offenses in this case. Indeed, Appellant testified that other than scaring him, she did not harm Mr. Lane during the incident in question. Appellant also placed the blame on the victim by testifying that the only reason the incident happened was because of the actions of Mr. Lane. In addition, after observing Appellant's demeanor and listening to her testimony, the trial court stated that Appellant was "very bitter," "very vindictive," "filled with anger," and "filled with resentment and hostility."

Finally, the district attorney general determined that justice would not be served by granting pretrial diversion in this case. First, the district attorney general determined that if pretrial diversion was granted in this case, it would create the impression that crimes involving domestic violence are not treated seriously. Second, the district attorney general determined that justice would not be served by rewarding a defendant who was given information about how to use lawful means to resolve a problem and then rejected those lawful means and resorted to violence.[3]

---

[3]The district attorney general also based his decision to deny the request for pretrial diversion on the need for deterrence. While Appellant is correct that the record does not contain any evidence about the need for general deterrence, we conclude that under the circumstances of this case, this factor does not affect the ultimate determination of whether the district attorney general abused his discretion when he denied the request for pretrial diversion.

As previously stated, the district attorney general's decision regarding the grant or denial or pretrial diversion is presumed to be correct and that decision will only be reversed when there has been "a patent or gross abuse of prosecutorial discretion." Houston, 900 S.W.2d at 714. The record indicates that the district attorney general considered the relevant factors when making the decision to deny the request for pretrial diversion. Further, the district attorney general's reasoning is supported by evidence in the record.[4] Under these circumstances, we conclude that the trial court properly determined that the district attorney general did not abuse his discretion when he denied the request for pretrial diversion. Accordingly, the judgment of the trial court is AFFIRMED.

_____
JERRY L. SMITH, JUDGE

CONCUR:

_____
NORMA MCGEE OGLE, JUDGE

_____
L. T. LAFFERTY, SENIOR JUDGE

---

[4]Appellant relies on State v. Kirk, 868 S.W.2d 739 (Tenn. Crim. App. 1993), for the proposition that the district attorney general abused his discretion when he denied the request for pretrial diversion. Although this Court held in Kirk that the district attorney general in that case had abused his discretion when he denied the request for pretrial diversion, this Court stated that the holding was based on the fact that there was no evidence in the record that supported the district attorney general's conclusory allegations. Id. at 742–43. As previously stated, that is not the case here.